406 P.2d 520 (1965)
ELLSWORTH BROTHERS, INC., Appellant (Plaintiff below),
v.
Harvey CROOK, Appellee (Defendant below), and
Lawrence Bruce (Defendant below).
No. 3392.
Supreme Court of Wyoming.
October 15, 1965.
*521 David Norman Burns, Jackson, for appellant.
Vincent A. Vehar, Evanston, for appellee.
Before PARKER, C.J., and HARNSBERGER, GRAY and McINTYRE, JJ.
Mr. Justice GRAY delivered the opinion of the court.
Plaintiff Ellsworth Brothers, Inc., an automobile dealer doing business in Idaho Falls, Idaho, purchased two used cars in Denver, Colorado, and arranged with one Glen D. Kneen, an independent contractor, for delivery of the cars to its place of business in Idaho. In attempting to make delivery Kneen left Denver driving one car, a Thunderbird, and towing the other, a Chevrolet. At about 5 p.m. on October 17, 1962, Kneen while proceeding northward upon a hard-surfaced, fenced, well-traveled highway at a point near Smoot, Wyoming, collided with a calf and a cow that were at a curve upon the highway, with resulting damages to both vehicles. Thereafter plaintiff commenced this action against defendant Lawrence Bruce, the owner of the cattle, and the defendant Harvey Crook, alleged to have been in charge of the cattle, to recover its damages. The action was tried to a jury and a verdict was rendered for plaintiff and against the defendants jointly in the approximate sum of $1,660. Thereafter motions were filed on the part of both defendants praying for judgment notwithstanding the verdict. The motions were sustained and the trial court directed that judgment be entered for defendants dismissing plaintiff's action. Plaintiff appealed from the judgment so entered.
Apparently plaintiff under its general charge of negligence  and in this we are unaided by any clarification of the issues through pretrial conference or otherwise  undertook to prove as one element of its claim that the defendants acting in concert in a joint enterprise violated the provisions of Ch. 46, § 53, S.L. of Wyoming, 1961 (§ 11-507, W.S. 1965 Cum.Supp.), which pertains to livestock running at large within the confines of fenced highways, and that such violation was the proximate cause of plaintiff's injuries.
As to this, the trial court in an informal written memorandum contained in the record and which is entitled to consideration here under Rule 52(a), Wyoming Rules of Civil Procedure, stated that one basis for its action in granting the motions was plaintiff's total failure of proof. In so concluding, the trial court made reference to our holding in Hinkle v. Siltamaki, Wyo., 361 P.2d 37, construing the provisions of the above statute and setting forth the elements necessary to prove a violation, and although counsel for plaintiff now asks this court to reconsider the pronouncements made in that case, we are not so inclined for several reasons. In the first instance plaintiff in its brief has specifically waived its appeal from the judgment absolving defendant Bruce from liability and with respect to the defendant Crook has taken a position here  which we later point out  that in essence constitutes a waiver of plaintiff's theory that defendant Crook was acting in violation of the statute. Consequently, the statute is not properly before us in this case and we have no occasion to review the Hinkle case, supra, except to say that nothing is presented that in any way indicates the decision to have been erroneous, and we would remind counsel that the legislature has twice been in session since the decision and so far as we are informed has taken no action to reject the interpretation placed upon the statute by this court.
The crux of this appeal lies in the exception taken by plaintiff to a further reason assigned by the court as a basis for absolving the defendant Crook wherein the court stated:
"Further, the cattle on and along the highway were, by the other defendant, either being moved to another place or he was attempting to move them off the highway. In either event he seemed *522 to be in charge and doing all he could under the circumstances."
With respect to this phase of the case plaintiff argues that there was substantial evidence to support the verdict of the jury and, by the granting of the motion on the grounds stated, the trial court invaded the province of the jury. Plaintiff's theory in this respect is that there was sufficient substantial evidence from which the jury could find that the defendant Crook was in charge of the cattle for the sole purpose of moving them down the highway to the ranch of defendant Bruce; that in making such use of the highway he failed to exercise ordinary care for the protection of other persons upon the highway as was his duty; and that the defendant Crook's negligence in performing that undertaking was the proximate cause of plaintiff's injury. In response counsel for the defendant Crook asserts that defendant Crook was simply endeavoring, as a volunteer, to remove the cattle from the highway and there was no substantial evidence upon which the jury could base a finding that said defendant was guilty of negligence proximately causing the accident. The respective contentions necessitate some further discussion of the evidence.
It is disclosed by the record that at the time of the accident the highway was dry, the sun was just going down, and it had been a nice, clear day. The highway in question is well traveled and runs through a somewhat hilly part of Wyoming. There are numerous curves in the area where the accident occurred. The speed limit was sixty-five miles per hour and Patrolman Erickson, who investigated the accident, testified that the curve involved here was a moderately well-banked curve and was "not particularly dangerous." At that point the surfaced portion of the highway was twenty-four feet in width with a borrow pit of some nine feet between the surfaced portion and embankments that were on both sides of the highway at the curve.
Kneen, called as a witness for plaintiff, testified that he was driving in the northbound lane at approximately forty miles per hour just before coming to the curve and in order to prevent "jacknifing" of the towed vehicle while rounding the curve he accelerated to between forty-five or fifty miles an hour. At about that time he observed cattle coming toward him on the highway at a distance of between 100 to 150 feet, "running pretty fast." There were about twelve head of cattle involved. Not all of the cattle were on the highway and there were none in the southbound lane. In response to questions concerning his reaction he said his first reaction was to look for "an opening and try to avoid hitting them and when I saw that was impossible I just did everything I could to stop and avoid hitting them." He also said, "Well, I applied the brakes and I didn't want to lose control of the car if I could help it but I saw that there was no way else  it is so hard to explain what actually did happen, because I just tried my best to stop." According to the measurements taken by the patrolman the Thunderbird skidded a total distance of 101 feet before coming to a stop. All of the "skid marks" were in the northbound lane of traffic and the car came to rest within a few feet after striking the calf and the cow. The Chevrolet broke loose from the tow at about the time Kneen applied his brakes, went up the right-hand embankment to some extent, caromed off into the southbound lane of traffic, and collided with defendant Crook's pickup at a distance of some 122 feet from where it broke loose.
Just how the cattle got there is not made entirely clear in the record. However, there is uncontroverted evidence that the cattle had been ranging west of the highway; that the ranch of defendant Bruce was down the highway, south of the curve which was the direction the cattle were traveling; that although the highway was fenced there were gates and side roads near the place of the accident; *523 and that a fence on the west at about the same point was "very poor fence." All of this evidence tended to show that the cattle had "drifted" into the highway going from the range to the ranch of defendant Bruce. In addition the defendant Bruce testified without contradiction that no arrangements had been made with the defendant Crook to move the cattle over the highway. Also in regard to this, the defendant Crook, when called as a witness by plaintiff under Rule 43(b), W.R.C.P., said that he was traveling south on the highway in his pickup and first observed the cattle drifting south "along the road" at a distance of some 300 to 400 feet north of the curve where the accident occurred. Nevertheless, on the basis of a statement made to Kneen by the defendant Crook at the time of the accident that he was "herding them back to the owner's property" and a statement made to an insurance adjuster that "I started them up the road to put them in his field"  meaning the ranch of defendant Bruce  the plaintiff argues that there was sufficient evidence to sustain its theory. We do not agree. First the admissions are not inconsistent with the direct testimony upon the question. Secondly, "Inferences contrary to direct testimony are not ordinarily sufficient to support a finding." Forbes Company v. MacNeel, Wyo., 382 P.2d 56, 57.
That, however, does not entirely dispose of plaintiff's theory. Plaintiff argues that even though the defendant Crook first saw the cattle "along the highway" he thereupon took charge for the purpose of moving them down the highway to the ranch of defendant Bruce and in so doing the defendant Crook was charged with using the same degree of care as that imposed upon a person using the highway for the sole purpose of moving livestock from place to place. We are also unable to accept that premise.
In the first instance, we are convinced that the only inference which could be drawn from the evidence relating to the defendant Crook's undertaking was that he acted throughout as a volunteer. Consequently, regardless of any standard of care which the law might impose upon a person using the highways as a means of moving livestock, on foot, from place to place  a matter we do not decide because that question is not before us  such standard is not applicable here. The conduct of the defendant Crook is to be measured by what the law expects and demands of a volunteer.
Here we find somewhat of an anomaly. There was early embodied in the law of negligence a distinction between "misfeasance," which meant "active misconduct working positive injury to others," and "nonfeasance," which simply meant "passive inaction or a failure to take steps to protect them from harm." Prosser on Torts, § 54, p. 334 (3rd Ed.). This author goes on to say, "The reason for the distinction may be said to lie in the fact that by `misfeasance' the defendant has created a new risk of harm to the plaintiff, while by `nonfeasance' he has at least made his situation no worse, and has merely failed to benefit him by interfering in his affairs." While that concept has undergone some evolution in the cases under particular circumstances, out of that early view there also developed the general principle that a volunteer, once having launched on an undertaking to render aid, would be held responsible for the negligent performance thereof. A succinct statement of that rule is contained in Nelson v. Union Wire Rope Corporation, 31 Ill.2d 69, 199 N.E.2d 769, 773, wherein it is said:
"Before considering the particular facts of this case, we think it well to examine the legal foundation upon which plaintiffs' actions are based. Originating with the decision of Coggs v. Bernard, 2 Lord Raymond 909, it has come to be a recognized principle that liability can arise from the negligent performance of a voluntary undertaking. In our times a clear and oft-cited statement of the principle is the language of Justice Cardozo in Glanzer v. Shepard, *524 233 N.Y. 236, 135 N.E. 275, 276, 23 A.L.R. 1425, when he said: `It is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all.' * * *"
The corollary was, of course, that there was no duty on the part of a bystander to take action and hence no liability if, as could have been the case here, the observer, unmoved by emotions or moral considerations, simply looked the other way and let his neighbor and the traveler upon the highway fend for themselves. Consequently, it is not surprising that the rule has caused consternation to the uninformed. It has also been severely criticized as an ominous threat to those possessed of a commendable desire to come to the aid of their fellow man. In fact by 1964, under impetus of the medical profession, the legislatures of twenty-eight states, including Wyoming, have taken cognizance of the concept and have in certain respects undertaken to alleviate apprehension by the enactment of so-called "Good Samaritan" laws. The tenor of such laws is to prescribe a less rigid standard of care. 18 Vand.L.Rev. 323, 325 (1964). Our statute, for example, Ch. 42, § 1, S.L. of Wyoming, 1961 (§ 33-343.1, W.S. 1965 Cum.Supp.), which seems to relate to rendition of medical aid at the place of an emergency or accident  a matter we do not decide  provides that the actor "shall not be liable for any civil damages for acts or omissions in good faith." Whether or not that public policy should be broadened to protect other volunteer undertakings is, of course, a matter for the legislature to decide. Our function is to delineate the law as we find it. Wilcox v. Herbst, 75 Wyo. 289, 295 P.2d 755, 762.
Although we have not heretofore been called upon to inquire into the conduct of a volunteer under circumstances such as we have here, we are not entirely strangers to the teachings in that body of the law. Just recently, in Franklin v. Lowe, Wyo., 389 P.2d 1012, 1014, this court considered the proper standard to be imposed under the so-called "rescue doctrine." In measuring the conduct of the rescuer we adopted the standard of reasonable care and subscribed to a comment on the rule that the question is "not what a careful person would do under ordinary circumstances, but what would he be likely to do, or might reasonably be expected to do in the presence of the existing peril."
Akin to the rationale of that rule, as we view it, is the rule set forth in A.L.I. Restatement of the Law (Second) Torts 2d § 324A, p. 142 (1965), insofar as it relates to the conduct of a volunteer. The rule is stated as follows:
"One who undertakes, gratuitously * * * to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if (a) his failure to exercise reasonable care increases the risk of such harm, * * *."
There is much to commend such rule. In the first instance it is the most recent concise statement of the rationale underlying many decisions pertinent to the specific question presently before us. Secondly, we think it strikes an acceptable and reasonable balance sufficiently to afford reasonable protection to the so-called "Good Samaritan," thus encouraging rendition of needed aid, and at the same time affords protection to the injured or those in danger of injury from the consequences of an undertaking by a volunteer that, in performance, fails to measure up to that standard of care reasonably necessary to avoid increasing such harm or risk of harm. For such reasons we subscribe to that rule.
The evidence pertinent to this issue emanates almost entirely from the testimony of the defendant Crook. With respect to the important matter of the relative position of the cattle upon the highway, i.e., whether on the oil mat, the shoulders, or the borrow pit, and just what the cattle were doing at *525 the time the defendant Crook first observed them, the defendant Crook testified that the cattle were "pretty well" in a bunch, but spread out over a distance of some fifty feet; that they were all on the east portion of the highway. By marks upon a photograph the witness placed some of the cattle on the east shoulder of the highway and some on the east edge of the oil mat and stated that "They were feeding along the road," drifting south. We should mention also that the general location of the cattle was fixed as being some 300 to 400 feet north of the curve here involved and the photograph above mentioned would appear to demonstrate that the embankment on the east side of the highway at the curve extended to the point where the cattle were found but that the embankment on the west side of the curve dropped off before reaching that point, thus indicating substantially more space than nine feet between the oil mat and the west fence of the highway. That was somewhat contrary to the defendant Crook's testimony that "there was no way of getting them off right there" because the road was right against the hill.
The defendant Crook also testified that when he came upon the cattle he recognized the danger. He had seen "too many wrecks along there to let [the] cattle stay on the highway" and his first thought was to get the cattle off and thus prevent injury to the cattle and to automobiles and their occupants. To accomplish that purpose he stopped his pickup, "hollered" and whistled at the cattle, and pounded the side of the pickup with his hand, hoping that the cattle "would take off up the road so I could get them off." It was his thought to get them off around the curve. He also said that he was well acquainted with the habits of cattle being driven on the highway and that in driving cattle he usually rides a horse in order to keep the cattle on the outside bank. When asked how the cattle responded to the noise, the defendant Crook said they started up the road and "I don't think they run like he [Kneen] said." Also that some of them might have been trotting, although he could not remember. He followed along slowly with his pickup. When asked how the cattle "went up the road" he first stated that they were "clear across the whole road." However, later he testified that he couldn't say they were all over the road and "No, they wasn't walking up the road all together. I think they were pulling towards the right side [west side] of the road when they come round the bend."
From what has been set forth it is apparent that the trial court erred in concluding as a matter of law that the defendant Crook was "doing all he could under the circumstances." There was conflict in the evidence and there was evidence from which more than one inference could be drawn. A jury might or might not have believed that the defendant Crook increased the risk of harm to plaintiff by disturbing the cattle "feeding along the highway" in the manner described, for the purpose of getting them off the highway at a point around the curve with no other assistance or facility than his "pickup." In Neal v. Wailes, Wyo., 346 P.2d 132, 134, a collision case between animals on the highway and an automobile, we said:
"* * * It is not proper for this court in a case tried before a jury to exercise any authority beyond the periphery of its ordinary power but leave to the jury the function of finding the facts as heretofore exercised under the rules of common law, reconciling the conflict in the evidence, and drawing its own inference, if more than one inference is permissible. * * *"
That pronouncement is applicable here. See also Honan v. Moss, Wyo., 359 P.2d 1002, 1008.
However, the defendant Crook argues that, in any event, the trial court acted properly for the reason the evidence established, as a matter of law, that the negligence of the driver Kneen was the sole proximate cause of the accident. It is the defendant's contention that Kneen failed to keep a proper lookout and failed to keep the cars under proper control. The argument is based upon testimony that Kneen, *526 in rounding the curve, had a range of vision of at least 300 feet and should have seen the cattle and been able to stop. Such testimony was, of course, in conflict with the testimony of Kneen tending to show that he was alert and cognizant of the curve and did not see the cattle until they were 100 to 150 feet ahead of him in his lane of travel. We think it was a jury question. McDowall v. Walters, Wyo., 360 P.2d 165, 169, rehearing denied 361 P.2d 528. Apparently the trial court was also of that view inasmuch as the contention was not assigned as a basis for setting the verdict aside.
In view of the foregoing, the judgment for the defendant Crook cannot stand. However, that does not entirely solve our difficulties in disposing of this appeal. As we view it, the circumstances are such that the verdict of the jury cannot be reinstated. In the first instance it will be recalled that it was a joint verdict and the judgment entered setting it aside, insofar as the defendant Bruce was found liable, has for all purposes become final as a result of plaintiff's waiver of the appeal from that part of the judgment. Further than this it seems apparent the jury accepted plaintiff's theory that the defendant Bruce and the defendant Crook were engaged in a joint enterprise in moving the cattle on the highway  a theory which should not have gone to the jury. Just what influence that had on the finding of liability against the defendant Crook is a matter of speculation. Had the jury been limited to determining the responsibilities of the defendant Crook as a volunteer under proper instructions, it is entirely possible a different result might have been reached on the question of his liability. Under the circumstances it would appear that any effort to treat the joint verdict as a separate verdict against the defendant Crook and to reinstate it as such would result in a manifest injustice. The interests of the parties will best be served by granting to plaintiff a new trial of its claim against the defendant Crook in accordance with the views heretofore expressed.
Reversed and remanded for new trial.
HARNSBERGER, Justice (dissenting).
The single question before the court in this appeal is whether there was any substantial evidence given the jury which supported its verdict. The trial court held there was not, and with that holding I agree.
The only evidence of what Crook did or failed to do came solely from Crook himself.
The record of Crook's testimony is replete with his positive statements that when he came upon the cattle some of them were on the oiled surface of the highway. Also, the only additional evidence was developed by Crook's marking a photograph of the area with red ink. These ink markings bore out his statements that the cattle were on the oiled highway when he first saw them. There was no conflicting evidence.
Crook's further testimony was that he "hollered," whistled, and pounded the side of the car in his effort to move the cattle. His testimony that his idea was to drive them beyond the dangerous area to their owner's ranch is without probative value. It was only what he did or did not do which determined whether or not he was negligent. Intention is not negligence as the majority evidently holds it to be.
As long as this majority decision stands, travelers upon our highways must beware of attempts to move livestock off the traveled surfaces and must not at their peril shout or "holler" at them or whistle or pound the sides of their vehicles in an effort to move them from the roadways.
The trial court's judgment should be upheld.